Scott Fink and Lera Mae Fink v. Commissioner.
Fink v. Commissioner
Docket No. 89725.
United States Tax Court
T.C. Memo 1964-75; 1964 Tax Ct. Memo LEXIS 261; 23 T.C.M. (CCH) 475; T.C.M. (RIA) 64075; March 19, 1964
*261 Petitioners and others, believing they had an opportunity to obtain a license to operate a television station, formed Wespen Television, Inc., to handle the transactions required in filing and prosecuting the application. Wespen issued $6,000 of common stock for cash, of which petitioner purchased $3,000, the remaining $3,000 being issued to the remaining two incorporators. All of those interested agreed that this amount was not adequate capitalization. Twenty-six individuals, including petitioner, subscribed to stock and notes of the corporation. The subscribers were assessed six percent of their subscriptions, as a result of which petitioner paid an additional $1,875 into the corporation. Petitioner also advanced $22,000 to the corporation to meet expenses and personally paid corporate expenses in the amount of $3,583.49. Upon liquidation of the corporation, petitioner received $1,611 as a return on his assessments and $17,000 as the return of his advances to the corporation. He received nothing designated as a return on his stock or for the payments expended on behalf of the corporation. Held: The loss incurred by petitioner from the liquidation and dissolution of Wespen Television, *262 Inc., is to be treated as a capital loss. Scott Fink, pro se, R.D. 4, Irwin, Pa. Hobart Richey, for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in income tax of the petitioners for the year 1957 in the amount of $3,035.64. The single issue for our determination is the classification of the loss incurred by petitioners arising upon the dissolution and liquidation of Wespen Television, Inc., a corporation formed for the purpose of making application for a television license. Findings of Fact All facts contained in the stipulation filed by the parties *263 are so found and made a part hereof by this reference. The petitioners are husband and wife residing at R.D. #3, Irwin, Pennsylvania. Petitioners are on the cash basis method of accounting and reporting income for Federal tax purposes. They filed their joint income tax return for the taxable year 1957 with the district director of internal revenue, Pittsburgh, Pennsylvania. Since Lera Mae Fink is a party to this proceeding only because she filed a joint income tax return for the year 1957, Scott Fink will hereinafter be referred to as the petitioner. Petitioner is a lawyer practicing as a member of the firm of Fink & Jennings in Greensburg, Pennsylvania. He was admitted to practice in 1913 and has been a practicing attorney from 1913 through the time of trial. In November 1952, the Federal Communications Commission (hereinafter sometimes referred to as the FCC) allocated VHF Television Channel 4 to Irwin, Pennsylvania. Petitioner considered that this presented a possible opportunity to obtain a license to operate the channel in question. On January 2, 1953, petitioner and two other interested persons caused to be formed Wespen Television, Inc., (hereinafter sometimes referred *264 to as Wespen) a Delaware corporation. From that time until October 1957, all of the transactions in filing and prosecuting an application for the television license were conducted in the name of and through the form of Wespen. Wespen was formed for the purpose recited, in part, in its charter: To carry on * * * the business of television and radio broadcasting * * *. * * *
To apply for, receive, hold and enjoy any and all licenses, permits and grants necessary, appropriate or convenient for the erection, construction, maintenance and operation of television and radio broadcasting stations, * * *
To enter into, make and perform contracts of every kind for any lawful purpose, * * *
Wespen would have operated the station had the application been successful. Wespen, at its incorporation, issued for cash only the nominal amount of $6,000 of its common stock without par value, at $100 per share. No other stock was ever issued by Wespen. Petitioner and others interested in the Wespen application knew at that time that $6,000 was not sufficient capitalization to prosecute the license application. Petitioner bought $3,000 of the $6,000 issued common stock of Wespen. *265 On March 2, 1953, petitioner and 25 other persons entered into a written stock subscription agreement and a written note subscription agreement with one another and with Wespen, the stock subscription and note subscription each aggregating $451,000, and each expressly conditioned upon Wespen receiving from the FCC a construction permit, within five years, for the television broadcasting station. Petitioner's stock subscription was $31,250. His note subscription was for a like amount. As the prosecution of the application continued, it was necessary for the board of directors of Wespen to secure permission to assess upon the stock subscription agreements. By resolution adopted at a meeting of the officers, directors and stock subscribers of Wespen on January 15, 1954, and amended on July 20, 1954, the directors were authorized to call up to 10 percent of the stock subscriptions previously executed. These resolutions specifically waived the condition that no call be made until the issue of the license by the FCC to Wespen. Wespen, pursuant to the authority granted, did make an assessment of 5 percent against all stock subscribers on or about August 25, 1954, and a subsequent assessment *266 of 1 percent on or about June 28, 1955. Petitioner, on August 25, 1954, paid $1,562.50 to Wespen and received an obligation payable in stock or notes of the corporation in that amount conditioned upon receipt of a construction permit from the FCC. On July 1, 1955, petitioner paid into Wespen $312.50 and received a similar obligation. Petitioner's total payment arising out of the 6 percent stock assessment was $1,875. Petitioner, in addition, advanced Wespen $10,000 on June 13, 1953; $7,000 on May 21, 1954, and $5,000 on September 28, 1954. Petitioner had the option to credit these advances against his subscription agreements. Also, during the period 1952 through 1957, petitioner advanced, for the benefit of the corporation, sums of money totaling $3,583.49. Wespen filed its application for Channel 4 with the FCC on June 13, 1953. There were four other applicants. A comparative hearing of these five applications ensued at Washington, D.C. Final argument before the FCC was held on June 2, 1957. When it became apparent that the FCC had narrowed the choice down to 2 of the 5 applicants, these two joined forces and offered the three other applicants, of which Wespen was one, $50,000 *267 each to withdraw their respective applications. Wespen accepted and the FCC dismissed Wespen's application on its own petition. Wespen maintained a bank account from which were paid expenses incurred in the prosecution of the license application in the amount of $64,729.07. At a meeting of the officers, directors and stock subscribers of Wespen, just prior to Wespen's dissolution, it was agreed to return the sum of $23,200 in payment of the $27,000 obtained through the 6 percent assessments. As a result, petitioner received $1,611 as a return of his 6 percent stock assessment of $1,875. Petitioner also received $17,000 from Wespen as payment for the advances he made to Wespen in the total amount of $22,000. He received nothing designated as a return on his stock or for the money advanced on behalf of Wespen. The following summarizes the investments made by petitioner during the years 1952 through 1957, the repayments made during the year 1957 and the losses suffered during the year 1957. Investment
Repayment
Loss
Stock purchased
$ 3,000.00
$ 3,000.00
6% stock assessment
1,875.00
$ 1,611.00
264.00
Advances to corporation
22,000.00
17,000.00
5,000.00
Advances for corporation
3,583.49
3,583.49
$30,458.49
$18,611.00
$11,847.49
*268 Petitioner was the president and a member of the board of directors of Wespen. Wespen was dissolved under the laws of the State of Delaware on October 2, 1957. [1]
Petitioner, on his 1957 Federal income tax return, reported a loss of $11,847.49 which he deducted as an ordinary loss arising from a "Joint Venture - Television Application." The respondent conceded both the amount of the loss and that it was incurred in the year 1957, but determined that all payments and advances which petitioner had made to or on behalf of Wespen, represented capital contributions which were deductible only as capital losses. He further determined, in the alternative, that if any part of such payments or advances represented loans to said corporation, any loss resulting from the failure of *269 the corporation to repay such loans was a nonbusiness bad debt which is to be considered a capital loss. Ultimate Finding of Fact The enterprise involving the filing and prosecution of the application for the television license was carried on by Wespen, a corporation in which petitioner was a stockholder and stock subscriber and not through the form of a joint business venture of the stockholders and stock subscribers of that corporation. Opinion Our problem is to determine how the losses which the petitioner incurred in respect to the several payments and advances which he made to or for the benefit of Wespen, a corporation, should be classified for deduction by him for Federal income tax purposes. The FCC, in November of 1952, allocated a television channel to be located in Irwin, Pennsylvania. Petitioner, a practicing lawyer, and others associated with him, believed they had an opportunity to obtain the license to operate this television channel. In 1953 Wespen was formed and all of the transactions involved in filing and prosecuting the application for the television license were carried on through Wespen and in its name. Twenty-six individuals, including petitioner, *270 subscribed to stock and notes of Wespen, aggregating $451,000 in each category. Petitioner subscribed to $31,250 of stock and a like amount of notes. Only the amount of $6,000 was paid in for stock of Wespen although all of the individuals interested agreed that this was not sufficient to prosecute the application. Of the amount paid in for the original $6,000 stock issue, $3,000 was paid by petitioner. It was necessary for the board of directors of Wespen to secure permission from the stock subscribers to make assessments on the stock subscription agreements in order to properly prosecute the application. The board was authorized to assess up to 10 percent of the stock subscriptions and did assess a total of 6 percent, of which petitioner paid $1,875. In addition, petitioner advanced money to the corporation to meet expenses and also personally paid a number of corporate expenses. At no time did Wespen receive any indication that its application was being given favorable consideration. In 1957 Wespen was approached by two of the other applicants with an offer of $50,000 to withdraw its application. All of those concerned felt the offer should be accepted. It was their belief *271 that no chance remained of Wespen becoming the recipient of the license. Petitioner (who had subscribed to $31,250 of stock in Wespen) had invested $30,458.49 in Wespen by the time the corporation accepted the $50,000. From this amount the corporation paid certain outstanding expenses and distributed the remainder to those persons who had made advances to the corporation. For division among the 6 percent assesses, $23,200 was made available for distribution. Petitioner received $1,611 as his share. He also received $17,000 in return for the monies advanced to the corporation. Thus, petitioner, who had invested $30,458.49, received only $18,611 in return. On his 1957 Federal income tax return, petitioner reported a loss of $11,847.49, which he deducted as an ordinary loss. Respondent, while conceding both the amount of the loss and the year in which it was incurred, determined that it was a capital loss rather than an ordinary loss. Petitioner takes the position that at all times the intent of all those concerned was to be members of a joint venture whose purpose was to obtain an FCC license to operate a television station. He further argues that the corporation was merely the *272 channel or device employed for the receipt and disbursement of funds advanced by the members of the joint venture and, in addition, that the corporation was only the mechanism or vehicle whereby the application for the television license was transmitted, by the members of the joint enterprise, to the FCC. It follows, the petitioner contends, that any loss sustained from participation in the joint venture would be an ordinary individual business loss. Respondent, on the other hand, determined that the entire investment of petitioner in Wespen was a contribution to capital resulting in capital loss upon the liquidation of the corporation. In the alternative, respondent asserts that if part of the investment of petitioner is found not to have been a contribution to capital, it was then a nonbusiness loan which resulted in a nonbusiness bad debt and, as such, became a capital loss upon the liquidation of the corporation. The respondent's determination is presumptively correct and the burden is upon petitioner to show error on the part of respondent. The position of petitioner fails to find support in the evidence and we are satisfied that it is without merit. The legal relationship *273 known as a joint venture has been defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation" and also as "an association of persons to carry out a single business enterprise for profit." ; and cases cited therein. The terms of such relationship may be informal and need not be reduced to writing. . Wespen was organized as a corporation under the laws of the State of Delaware. It actively operated as a corporation in maintaining a bank account into which deposits were made and on which checks were drawn, in holding meetings of stockholders and stock subscribers of the corporation, in filing the application for a license to operate a television station with the FCC, and in executing an agreement with several other applicants to accept $50,000 to withdraw its application and in fact withdrawing its application for a license. All of these actions were taken by the corporation and under the corporate name. In no sense *274 was the enterprise a joint venture. In our opinion it was clearly subject to the provisions of the law pertaining to corporations rather than partnerships. The general rule is that, except in unusual circumstances (not here present), a corporation is to be treated as an entity separate from the individuals who own it. Moreover, as was recognized by the Supreme Court in , where persons have employed the corporate form for carrying on business, any disadvantages which may result from the use of such form are not to be disregarded. The need for petitioner's advances was largely attributable to Wespen's insufficiency of working capital. Wespen's capital was admittedly inadequate to carry on the business for which it was formed. While not necessarily conclusive, this is obviously a factor to be considered in determining whether the advances were contributions to capital. ; (C.A. 2, 1952), affirming . The $3,000 investment of petitioner at the formation of the corporation is clearly a contribution *275 to capital. Petitioner subsequently, under two assessments, paid into the corporation $1,875. In return he received a receipt entitling him to be paid in stock or notes of Wespen when Wespen was successful in obtaining the television license. It was expected that the assessments would be credited against the stock and note subscription agreements previously executed. Petitioner and the other stock subscribers by waiving the license-issue condition of the original stock subscription agreement and paying in part of their respective shares of the subscription, were clearly making a contribution to the capital. The obvious intent was to make this money subject to the risk of the business. , affd. (C.A. 2, 1945); Petitioner advanced Wespen $10,000 on June 13, 1953; $7,000 on May 21, 1954, and $5,000 on September 28, 1954, and, in addition, advanced $3,583.49 for the benefit of Wespen, independent of the other stockholders or stock subscribers. A consideration of the record as a whole supports the inference that petitioner's intent was to have these funds credited against the *276 subsequent assessment, expected upon the granting of the television license, and to receive stock in proportion to the money he advanced to the corporation. In any event, petitioner, bearing the burden of proof, has produced no evidence to the contrary. Under all of the circumstances, we are persuaded that the expectation of repayment, in the form of securities of the corporation, was based only upon the possible granting of the television license to Wespen, and that petitioner was satisfied to let his money ride with the success or failure of the venture, hoping that the license would be granted to Wespen and that he would someday reap the fruits of a successful investment. The circumstances discussed above lead us to the conclusion that the advances were intended as risk capital, notwithsanding that the advances were not made by all stockholders or stock subscribers in proportion to their interest. See ; . It is not necessary, however, to rest our decision solely on the conclusion that the advances reflected risk capital rather than loans, for we are satisfied, in any event, *277 that they cannot qualify as business loans. The business of the corporation may not be treated as the business of the stockholder. and cases cited therein. We have recently reviewed the law in the area of nonbusiness loans in , affirmed per curiam (C.A. 3, 1962), in which we said, in part: It is well settled that if the integrity of the corporate form remains intact the business of a corporation is not the business of its stockholders or officers, , , and this is so notwithstanding the fact that the stockholders may have devoted most of their time to the business of the corporation. affd. (C.A. 10, 1957); ; , affd. (C.A. 4, 1960). As we stated in , affirmed *278 per curiam (C.A. 3, 1954), an officer or employee "cannot appropriate unto himself the business of the various corporations for which he works." Furthermore, even if we assume that * * * [petitioner] was in the trade or business or being an officer or employee of the corporation, the lending of money by a corporate employee to his corporate employer has been held not to be proximately related to such a trade or business. ; see also . Cf. , revd. (C.A. 2, 1961). * * * In the light of the facts before us, we think the only conclusion we can reach is that petitioner was not in the business of lending money to or promoting business enterprises or organizations. , rehearing denied . Under the circumstances, had we found that any or all of the advances made by petitioner were not contributions to capital, they would be nonbusiness loans to be treated as capital losses under section 166(d)(1)(B) *279 of the Code of 1954. Decision will be entered under Rule 50. Footnotes
1. It has been stipulated that the corporation was dissolved under the laws of the Commonwealth of Pennsylvania. However, there is documentary evidence that the corporation was dissolved under the laws of the State of Delaware, the state of incorporation. The difference between the documentary recitals, reflected in the findings and the stipulation does not appear to be material to the issue of this case.↩